Filed 3/9/16; pub. order 3/28/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LINDSEY FENIMORE et al., | B262186 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC121657) |
| v. | |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge.  Reversed with directions.

Garcia, Artigliere & Medby, Stephen M. Garcia, William M. Artigliere and Mark A. Schadrack for Plaintiffs and Appellants.

Steven D. Davis Law Group, Steven D. Davis and Diane M. Daly for Defendants and Respondents.

* * * * * *

According to the complaint in this case, George Fenimore, Jr. (George), was a patient at Resnick Neuropsychiatric Hospital in March 2013 when he fell and suffered a hip injury from which he never recovered.[1] George died in July 2013. Plaintiffs Lindsay Fenimore (for herself and as successor in interest to George), George Fenimore III, and Marian Fenimore sued the Hospital for elder abuse, negligence, negligent hiring and supervision, and wrongful death. The Fenimores appeal from the judgment entered after the court sustained the demurrer of the hospital to the causes of action for elder abuse and negligent hiring and supervision. Their arguments on appeal relate only to the elder abuse cause of action. We reverse the judgment with directions to enter a new order overruling the demurrer to the elder abuse cause of action.

## FACTS AND PROCEDURE

The Fenimores filed their complaint in November 2013. After the Hospital filed a demurrer and motion to strike portions of the complaint, the Fenimores filed a first amended complaint (FAC) in lieu of opposition.

### 1. *Facts Alleged in the FAC*

Because this appeal arises from an order sustaining a demurrer, we summarize and accept as true the factual allegations of the FAC. (*Mack v. Soung* (2000) 80 Cal.App.4th 966, 968.) The Fenimores' FAC alleged as follows with respect to elder abuse. George was over the age of 65 at all relevant times. (Welf. & Inst. Code, § 15610.27 ["'Elder' means any person residing in this state, 65 years of age or older."].)[2] Around March 2013, George suffered an onset of dementia and Alzheimer's disease. He began wondering away from home, was confused, and experienced an increased number of

---

[1]     The complaint stated Resnick Neuropsychiatric Hospital is at the University of California, Los Angeles (UCLA). The named defendants are the Regents of the University of California Health Sciences and Services and UCLA Health Systems. For simplicity, we will refer to defendants as "the Hospital."

[2]     Further undesignated statutory references are to the Welfare and Institutions Code unless otherwise noted.

2

falls. His family admitted him to a local hospital on a "5150 hold" and then transferred him to the defendant Hospital to protect him from falls and wandering.[3]

The Hospital admitted him on March 29, 2013. It was advised that George suffered from dementia, Alzheimer's disease, coronary artery disease, congestive heart failure, hypertension, hyperlipidemia, diabetes, gout, a history of pancreatitis, a history of a cholecystectomy, and a history of wandering that led to numerous falls. The Hospital knew he had just been transferred from another facility on a 5150 hold and was an extreme fall risk. It further knew George required special care and assistance, including 24-hour supervision, assistance with ambulation and transferring, the provision of safety devices to prevent accidents, interventions to prevent further falls, and assistance with other activities of daily living.

Just minutes after entering the Hospital, George was left unattended and fell. In an attempt to conceal his fall, the Hospital did not immediately inform George's family, his legal representative, or his primary care physician of the fall. Hospital staff also failed to adequately assess George after the fall and noted only that he had superficial abrasions.

George's family arrived at the Hospital later the same day. The Hospital told them of the fall then but provided conflicting accounts of how it occurred. A nurse and occupational therapist told the family that George fell while trying to follow the nurse into the hall, landed on his knee, and was "sore but okay." Four hours after the fall, doctors at the Hospital recorded that George "suffered [a] mechanical fall just after reaching the unit, while nursing staff was changing his adult diaper." The Hospital engaged in this fraudulent cover up of his fall because the federal government has determined a fall is a type of "adverse event" or "never event" that does not occur except

---

**3** The term "5150 hold" derives from section 5150. Section 5150, subdivision (a) applies when a person is a danger to him- or herself or is gravely disabled because of a mental health disorder. Certain professionals "may, upon probable cause, take, or cause to be taken, the [endangered] person into custody for a period of up to 72 hours for assessment, evaluation, and crisis intervention." (§ 5150, subd. (a).)

in the absence of proper care by a hospital; Medicare does not pay for hospital stays in which adverse events occur.

For the next four days after his fall, George received no medical attention or further assessment. The day after the fall, one nurse noted in his record that he denied any pain; however, the same day, another nursing note indicated that he received acetaminophen for "leg pain." Three days after the fall, an occupational therapist noted George was guarding his leg and wincing when bending forward and lifting the knee. She recommended imaging of his hip. He was not walking at that time. The Hospital did not inform his family, primary care physician, or personal representative of this change in his condition or his need for evaluation. On April 2, 2013, four days after the fall, the Hospital transferred him out for totally unrelated reasons—acute renal failure and hyperkalemia. On April 4, 2013, X-ray results revealed that George had a left hip fracture. He had hip surgery that day and transferred to rehabilitation afterward. Unfortunately, he never recovered from this surgery and passed away from his injuries on July 21, 2013.

The Hospital failed to assess George's fall risk and implement an adequate plan of care for him, complete with interventions or other measures to prevent him from falling. Interventions it could have implemented included "lap buddies"—a device to prevent one from falling out of a wheelchair—or hip guards.

The Hospital also violated several sections of the California Code of Regulations applicable to acute psychiatric hospitals. By way of example, these regulations required it to properly train its staff, have a written patient care plan, and have a sufficient number of staff on hand for the safety of patients.[4] These regulatory violations caused injury to

---

[4] For instance, the FAC cited California Code of Regulations, title 22, section 71213, subdivision (c), requiring "a written organized staff education program," including "orientation and in-service education and training"; section 71213, subdivision (d), requiring "a written patient care plan developed for each patient," including "goals, problems/needs and approach"; section 71213, subdivision (f), requiring "a method for

George.  The Hospital acted with reckless disregard for the health and safety of George and other residents.

The Hospital had a pattern and practice of understaffing and undertraining its staff to cut costs, which foreseeably resulted in the abuse and neglect of its residents, including George.  It consciously chose not to increase staff numbers or increase training.  The Hospital knew that insufficient staff in number and competency would lead to it not meeting patients' needs, and injuries to patients would be not only likely but inevitable.  Had there been sufficient staff at the Hospital, George would have received proper supervision and assistance and would not have suffered his injuries.

The FAC sought general and special damages, and as to the elder abuse cause of action specifically, punitive damages and attorney fees and costs.

## 2.  *Trial Court Ruling Sustaining Demurrer in Part*

The Hospital filed a demurrer to the first cause of action for elder abuse, third cause of action for negligent hiring and supervision, and fourth cause of action for wrongful death.  It also filed a motion to strike portions of the FAC.

The trial court issued a tentative ruling the day before the hearing on the demurrer and motion to strike.  The tentative sustained the demurrer in part.  Specifically, it sustained the demurrer without leave to amend as to elder abuse and negligent hiring and supervision.  The tentative overruled the demurrer as to the wrongful death cause of action.  Regarding elder abuse, the tentative held "[t]he allegations do not qualify as the reckless withholding or denial of care necessary for decedent's basic needs," citing *Worsham v. O'Connor Hospital* (2014) 226 Cal.App.4th 331, 338 (*Worsham*).

The tentative granted the motion to strike, at least in part.  It said nothing about the portions of the elder abuse cause of action the Hospital sought to strike, likely because the court viewed the issues as moot, having sustained the demurrer to the entire cause of

---

determining staffing requirements based on assessment of patient needs"; and section 71225, subdivision (c), requiring "[a] sufficient number of appropriate personnel [to] be provided for the safety of the patients."

action. The tentative stated: "The Motion to Strike is granted. The references to neglect in the wrongful death claim are improper and irrelevant. General damages are not recoverable. Punitive damages are not recoverable from a public entity. See Government Code Section 818."

On the day of the hearing, the Fenimores' counsel filed a declaration regarding a proposed second amended complaint (SAC) and also lodged the proposed SAC. Counsel's declaration stated that, after receiving the tentative, he drafted an SAC designed to address the shortcomings the Court had identified in its tentative. The SAC alleged a list of 27 fall prevention interventions that the Hospital wrongfully withheld from George. For instance, the SAC alleged the Hospital could have kept fluids within his reach, implemented a toileting program, or used bed and chair alarms to alert staff of his attempts to stand. The SAC also added allegations that George had suffered a preventable and severe unstageable sacral pressure ulcer as a result of the Hospital's wrongfully withholding care to prevent the formation and worsening of pressure sores or ulcers. It further alleged the Hospital concealed the pressure ulcer from George's family and physician.

The court entered a final ruling identical in substance to its tentative order, except that it noted it was not considering the SAC. The Fenimores voluntarily dismissed their remaining causes of action for negligence and wrongful death. The court entered judgment in favor of the Hospital, and the Fenimores filed a timely notice of appeal.

## STANDARD OF REVIEW

We review the complaint de novo to determine whether it states facts sufficient to constitute a cause of action. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 (*Blank*).) "We treat the demurrer as admitting all material facts properly pleaded, but not contentions, deductions or conclusions of fact or law." (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591.) "Further, we give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." (*Blank, supra*, at p. 318.) "The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of

6

action under any possible legal theory." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 (*Aubry*).)

When the court sustains the demurrer without leave to amend, we determine whether there is a reasonable possibility the plaintiff can cure the defect by amendment. (*Blank, supra*, 39 Cal.3d at p. 318.) If the plaintiff can cure the defect, the trial court has abused its discretion and we reverse. (*Ibid.*) If not, no abuse of discretion has occurred, and we affirm. (*Ibid*.)

## DISCUSSION

Under the Elder Abuse and Dependent Adult Civil Protection Act (the Elder Abuse Act or the Act) (§ 15600 et seq.), abuse of an elder or dependent adult may take several forms, including "neglect" and "[t]he deprivation by a care custodian of goods or services that are necessary to avoid physical harm or mental suffering." (§ 15610.07, subd. (a).) As pertinent here, neglect means "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1).) Neglect includes, but is not limited to, the "[f]ailure to provide medical care for physical and mental health needs" and the "[f]ailure to protect from health and safety hazards." (§ 15610.57, subd. (b)(2), (3); see § 15610.35, subds. (a), (e).)

The Elder Abuse Act provides for heightened remedies to afford extra protection to the vulnerable population of infirm elders and dependent adults. (*Conservatorship of Kayle* (2005) 134 Cal.App.4th 1, 5.) Specifically, when the plaintiff proves by clear and convincing evidence that the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of neglect, the plaintiff may recover attorney fees and costs. (Welf. & Inst. Code, § 15657, subd. (a); *Delaney v. Baker* (1999) 20 Cal.4th 23, 31 (*Delaney*).) Additionally, on the same proof, plaintiffs bringing a survival action may recover damages for the decedent's predeath pain and suffering, although such damages may not exceed $250,000. (Welf. & Inst. Code, § 15657, subd. (b); Code Civ. Proc., § 377.34; Civ. Code, § 3333.2, subd. (b).) The Legislature intended these heightened

remedies "to enable interested persons to engage attorneys to take up the cause of abused elderly persons and dependent adults." (Welf. & Inst. Code, § 15600, subd. (j).)

The Elder Abuse Act's heightened remedies do not apply to acts of professional negligence. (§ 15657.2; *Delaney, supra*, 20 Cal.4th at p. 32.) Hence, the Act does not provide liability for simple or gross negligence by health care providers. (*Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 88 (*Sababin*).) Plaintiffs must plead and prove something more than negligence—that is, reckless, oppressive, fraudulent, or malicious conduct. (*Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 406 (*Carter*).) "The latter three categories involve 'intentional,' 'willful,' or 'conscious' wrongdoing of a 'despicable' or 'injurious' nature." (*Delaney, supra*, at p. 31.) Recklessness is "a subjective state of culpability greater than simple negligence, which has been described as a 'deliberate disregard' of the 'high degree of probability' that an injury will occur. [Citations.] Recklessness, unlike negligence, involves more than 'inadvertence, incompetence, unskillfulness, or a failure to take precautions' but rather rises to the level of a 'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.'" (*Id.* at pp. 31-32.)

Here, the FAC alleged the Hospital committed neglect by allowing George to fall minutes after entering the facility, failing to treat George's fractured hip for four days, and violating certain state regulations for acute psychiatric hospitals.

If the Fenimores alleged only these first two things, we might agree that the trial court correctly sustained the demurrer. According to the FAC, George fell within minutes of entering the Hospital, either because he was trying to follow a nurse into the hall, or when staff was changing his adult diaper. Alone, the fact that staff allowed him to fall suggests perhaps incompetence or unskillfulness. Recklessness, by contrast, lies in a "'conscious choice of a course of action.'" (*Delaney, supra*, 20 Cal.4th at p. 31.) The same can be said for the allegations relating to the treatment of his hip. It is not as though the Hospital did nothing at all, even according to the FAC. The nurses inquired about his pain, they gave him acetaminophen for it, and the occupational therapist noted his need

for an X-ray. The X-ray did not take place for several days. But there are no factual allegations showing this delay in diagnosis and proper treatment was more than mere incompetence or unskillfulness, i.e., negligence.

The allegations that the Hospital's regulatory violations constituted elder abuse add more to the story, however. Among other regulations, the FAC alleged the Hospital violated California Code of Regulations, title 22, section 71225, subdivision (c), requiring "[a] sufficient number of appropriate personnel [to] be provided for the safety of the patients" in an acute psychiatric hospital. The Fenimores' opening brief also points to another staffing regulation, section 71215, subdivision (c)(2), which mandates "[s]ufficient registered nursing personnel" to provide "direct nursing care based on patient need."

The regulations applicable to acute psychiatric hospitals "define those facilities' duties of care owed to their residents and therefore define duties of care applicable to elder abuse of those residents." (*Norman v. Life Care Centers of America, Inc.* (2003) 107 Cal.App.4th 1233, 1244 (*Norman*).) Thus, proof that a facility violated a regulation may constitute "'[t]he *negligent* failure of any person having the care or custody of an elder . . . to exercise that degree of care that a reasonable person in a like position would exercise.'" (*Id.* at p. 1243, quoting § 15610.57, subd. (a)(1); see *Norman, supra*, at p. 1246.) In *Norman* and *Conservatorship of Gregory* (2000) 80 Cal.App.4th 514 (*Gregory*), regulations applicable to skilled nursing facilities provided the duty of care by which the jury could judge neglect. (*Norman, supra*, at p. 1246 ["[A] violation by LifeCare of those regulations in caring for an elder constitutes elder abuse neglect under the Act"]; *Gregory, supra*, at pp. 522-523.) In *Gregory* in particular, the court rejected the defendants' challenge to a jury instruction based on staffing and other regulations, which the defendants alleged were too vague to provide meaningful guidance to the jury. The court held the jury could ascertain the regulations' meaning because the jury heard testimony describing how nursing homes construed and applied the standards regarding sufficient staff. (*Gregory*, at p. 524.) Like in *Norman* and *Gregory*, a violation of staffing regulations here may provide a basis for finding neglect. Such a violation might

9

constitute a negligent failure to exercise the care that a similarly situated reasonable person would exercise, or it might constitute a failure to protect from health and safety hazards (George's known fall risk). The former is the definition of neglect under the Act, and the latter is just one nonexclusive example of neglect under the Act. (§ 15610.57, subds. (a), (b)(3).)

Of course, the Fenimores still had to allege facts showing the Hospital acted recklessly, oppressively, fraudulently, or maliciously in the commission of neglect. (§ 15657). The FAC supplied allegations that may show recklessness. It alleged the Hospital had a pattern and knowing practice of improperly understaffing to cut costs, and had the Hospital been staffed sufficiently, George would have been properly supervised and would not have suffered injury. On a demurrer, we must accept the allegations as true and express no opinion on whether the Fenimores can ultimately prove these allegations. We must assume the Fenimores can prove by clear and convincing evidence that the Hospital was understaffed at the time George fell, that this understaffing caused George to fall or otherwise harmed him, and that this understaffing was part of a pattern and practice. If they do so, we cannot say as a matter of law that the Hospital should escape liability for reckless neglect. The trier of fact should decide whether a knowing pattern and practice of understaffing in violation of applicable regulations amounts to recklessness.

*Sababin* is instructive. In that case, the court found a triable issue of fact on recklessness when the defendant rehabilitation center had established but failed to follow a care plan of monitoring a patient's skin daily and reporting changes to a physician for treatment orders. (*Sababin, supra*, 144 Cal.App.4th at pp. 89-90.) The rehabilitation center had cared for the patient continuously for approximately three years when she was admitted to an emergency room and severe skin conditions were discovered. (*Id.* at p. 85.) The pertinent neglected care plan had been in place for approximately three months when the severe conditions were discovered. (*Id.* at pp. 85, 89.) The rehabilitation center had no skin condition reports on the patient, and no one at the center had notified her physician of the need for a treatment order. The court held the trier of

10

fact could infer reckless failure to provide medical care from this "significant pattern" of ignoring the care plan: "[I]f a care facility knows it must provide a certain type of care on a daily basis but provides that care sporadically, or is supposed to provide multiple types of care but only provides some of those types of care, withholding of care has occurred. In those cases, the trier of fact must determine whether there is a significant pattern of withholding portions or types of care. A significant pattern is one that involves repeated withholding of care and leads to the conclusion that the pattern was the result of choice or deliberate indifference." (*Id*. at p. 90.) Put otherwise, recklessness may be inferred when the neglect recurs in a significant pattern.

By way of analogy, here, if a jury were to find the Hospital knew of the staffing regulations, violated them, and had a significant pattern of doing so, it could infer recklessness, i.e., a "'conscious choice of a course of action . . . with knowledge of the serious danger to others involved in it.'" (*Delaney, supra*, 20 Cal.4th at pp. 31-32.) We decline to hold as a matter of law that such conduct does not constitute recklessness.

The trial court relied on *Worsham* to hold the understaffing allegations did not amount to reckless neglect under the Act, but we do not find *Worsham* controlling. In that case, the elder suffered a fall while recovering from hip surgery at a hospital's rehabilitative care unit. (*Worsham, supra*, 226 Cal.App.4th at p. 334.) The plaintiff alleged the hospital knew the elder was a fall risk; the hospital was "chronically understaffed" and undertrained the staff it did have; and the lack of sufficiently well-trained staff caused the decedent's fall. (*Id.* at pp. 334, 338.) The trial court sustained the hospital's demurrer to the operative complaint, holding that, although the plaintiff alleged the hospital acted recklessly by deliberately understaffing and undertraining, he had not sufficiently supported the allegations with particular facts. (*Id.* at p. 335.) The appellate court affirmed and held the allegations of failure to provide adequate staffing constituted nothing more than "negligence in the undertaking of medical services, not a 'fundamental "[f]ailure to *provide* medical care for physical and mental health needs."'" (*Id.* at p. 338, quoting *Delaney, supra*, 20 Cal.4th at p. 34.)

11

*Worsham*'s determination that understaffing constitutes no more than negligence may be true, *absent* further allegations showing recklessness. But the Fenimores have alleged more than a simple understaffing here. The FAC identified the staffing regulation the Hospital allegedly violated and suggested a knowing pattern of violating it constituted recklessness. A jury may see knowingly flouting staffing regulations as part of a pattern and practice to cut costs, thereby endangering the facility's elderly and dependent patients, as qualitatively different than simple negligence.

In addition, while *Worsham* focused on a "'fundamental "[f]ailure to *provide* medical care"'" as the way to show neglect under the Act, that is not the only way to prove neglect. (*Worsham, supra*, 226 Cal.App.4th at p. 338, quoting *Delaney, supra*, 20 Cal.4th at p. 34.) The Act defines neglect generally as the negligent failure of custodians or care providers to exercise the degree of care a similarly situated reasonable person would exercise, and then provides examples of neglect, including but not limited to the "[f]ailure to provide medical care for physical and mental health needs." (§ 15610.57, subds. (a), (b)(2).) As *Norman* and *Gregory* teach, violations of standards of care set by health facility regulations may provide a basis for finding the requisite negligent failure. Reckless understaffing might be neglectful under the Act even if it is not a fundamental failure to provide medical care.

Apart from recklessness, the Fenimores also alleged the Hospital was liable for elder abuse remedies because it acted fraudulently. (§ 15657.) They alleged the Hospital concealed George's fall from his family, knowing that the fall was an adverse event that would affect its Medicare funding. Unlike the allegations of recklessness in violating staffing regulations, we find these allegations of fraud insufficient. To begin with, the Hospital did not actually conceal the fall from George's family according to the FAC. The Hospital told the family of his fall the very same day it occurred. The FAC also alleged the Hospital did not tell the family members the truth of *how* the fall occurred and provided conflicting accounts. But if this is the alleged fraud, there were no allegations explaining how concealment of these details in particular caused harm to George, or how he and the family detrimentally relied on the concealment of these details. (*Carter,*

12

*supra*, 198 Cal.App.4th at p. 409 [allegations that hospital intentionally falsified medical records and covered up blood test results were insufficient to allege fraudulent neglect; allegations did not explain how the elder detrimentally relied on these alleged cover ups, or how they caused him harm].) The same is true to the extent the Fenimores attempted to allege the Hospital concealed the fall from some authority that might penalize it for an "adverse event." There were no allegations explaining how such concealment harmed George or how he detrimentally relied on it.

In sum, the FAC stated at least one viable theory of elder abuse based on recklessness. Because the court should not sustain a demurrer when the plaintiff has stated a cause of action under *any* possible legal theory (*Aubry, supra*, 2 Cal.4th at p. 967), and it may not sustain a demurrer to only a part of a cause of action (*Kong v. City of Hawaiian Gardens Redevelopment Agency* (2002) 108 Cal.App.4th 1028, 1047), the court should enter a new order overruling the demurrer to the elder abuse cause of action.

As to the court's ruling on the motion to strike, the Fenimores argue the order was vague, but in so far as it strikes allegations that support the elder abuse claim, we should reverse it. The ruling on the motion to strike is brief and does not expressly address the paragraphs of the elder abuse cause of action the Hospital sought to strike. We do not, therefore, construe it as granting the motion to strike those paragraphs. The only parts of the ruling that might have related to elder abuse were the statements that punitive damages were not recoverable from a public entity, and that general damages were not recoverable. The court cited Government Code section 818 for its holding on punitive damages. That section states: "Notwithstanding any other provision of law, a public entity is not liable for damages awarded under Section 3294 of the Civil Code or other damages imposed primarily for the sake of example and by way of punishing the defendant." (Gov. Code, § 818.) On appeal, the Fenimores have not argued the trial court erroneously applied Government Code section 818 to strike punitive damages claims, even though they have the burden of showing reversible error on appeal. (*State Farm Fire & Casualty Co. v. Pietak* (2001) 90 Cal.App.4th 600, 610.) We therefore see no reason to disturb the court's ruling in this regard. On general damages, the Hospital's

13

motion sought to strike general damages *only* with respect to the negligence and negligent hiring causes of action, arguing that general damages arising out of these causes of action did not survive the death of the decedent under Code of Civil Procedure section 377.34. But under the Elder Abuse Act, "[t]he limitations imposed by Section 377.34 of the Code of Civil Procedure on the damages recoverable shall not apply." (Welf. & Inst. Code, § 15657.) This is why elder abuse plaintiffs may bring a survivor action and recover damages for the elder's predeath pain and suffering. The court did not tie its ruling that "[g]eneral damages are not recoverable" to any particular causes of action. To the extent the court ruled general damages were not recoverable for elder abuse, that part of the order should be reversed.

## DISPOSITION

The judgment is reversed. On remand, the court shall vacate its order sustaining the Hospital's demurrer to the elder abuse cause of action and enter a new order overruling the demurrer to that cause of action, consistent with this opinion. The orders sustaining the demurrer to the cause of action for negligent hiring and supervision and overruling the demurrer to the cause of action for wrongful death need not be vacated. The order granting the motion to strike the claim of general damages is reversed to the extent it holds general damages are not recoverable for elder abuse. The Fenimores shall recover costs on appeal.


FLIER, J.

WE CONCUR:



BIGELOW, P. J.


GRIMES, J.

14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LINDSEY FENIMORE et al., | B262186 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. SC121657) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al., | |
| Defendants and Respondents. | NO CHANGE IN JUDGMENT |

THE COURT:[*]

      The opinion in the above-entitled matter filed on March 9, 2016, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

---

[*]    BIGELOW, P. J.            FLIER, J.               GRIMES, J.